**COMMONWEALTH of Pennsylvania**

**v.**

**THREE HUNDRED TEN THOUSAND TWENTY DOLLARS ($310,020.00) In United States Currency.**

**Appeal of: Dien Vy Phung.**

**Commonwealth of Pennsylvania**

**v.**

**$141,370.00 U.S. Currency.**

**Appeal of: Herman Keese.**

Commonwealth Court of Pennsylvania.

Argued Sept. 14, 2005.
Decide March 8, 2006.

Matthew R. Zatko, Somerset, for appellant, Dien Vy Phung.

Gregory J. Pagano, Philadelphia, for appellant, Herman Keese.

Andrea F. McKenna, Sr. Deputy Attorney General, Harrisburg, for appellee.

BEFORE: COLINS, President Judge, and McGINLEY, Judge, SMITH–RIBNER, Judge, FRIEDMAN, Judge, LEADBETTER, Judge, COHN JUBELIRER, Judge, and LEAVITT, Judge.

OPINION BY Judge LEAVITT.

These consolidated appeals involve the forfeiture of large sums of cash seized by the Pennsylvania State Police from vehicles that had been stopped for speeding. In each case, the trial court granted the Commonwealth's forfeiture petition because it concluded that the cash had been used for trafficking in illegal drugs. This conclusion was based, *inter alia*, upon the results of an ion scan of the seized cash that showed trace amounts of cocaine far in excess of the levels expected to be found on currency in general circulation. From these test results and the other evidence presented by the Commonwealth, each trial court inferred that the seized cash had a nexus to illicit drug activity. Because the inference was logical, given the totality of the circumstances in each case, we affirm.

## No. 2454 C.D. 2004

The background to the first appeal is as follows. On April 4, 2002, Trooper Wesley Berkebile stopped a vehicle for speeding on the Pennsylvania Turnpike and asked the driver for his operator's license and registration.[1] The driver, Dien Vy Phung, appeared unusually nervous and had difficulty responding to the request, but he eventually produced a Canadian operator's license and a rental agreement for the vehicle. The operator's license was suspended, and the rental agreement did not list Phung as a permitted driver or Pennsylvania as an authorized state of operation. Further, the rental agreement had lapsed two days earlier.

Berkebile asked Phung if he was carrying any narcotics, weapons or large amounts of cash, and Phung answered that he was not. Berkebile was granted permission to look through the car and did so, finding two bags in the trunk, each filled with cash.[2] Phung first told the officer that the cash totaled $60,000, but after he made a call on his cellphone stated that the cash totaled $260,000. A dog was dispatched to the scene and "alerted" on both bags, which, according to the dog's handler, indicated that the money had been in recent contact with drugs.

Phung was conducted to the State Police barracks. There the cash was counted, using a money counter borrowed from First National Bank of Somerset. The total was found to be $307,695; however, a subsequent count determined the actual total to be $310,020. While the cash was being counted, Phung was interviewed by Special Agent Akins of the Federal Bureau of Investigation, to whom Phung gave an account of how he came to possess over $300,000 in cash.

Phung explained that he left Canada in a rented van with his friend, Law, with the intention of acquiring a manicure salon in

---

1. The trial court stated that Sergeant Anthony DeLuca initially stopped Phung; however, the record indicates Trooper Berkebile initially stopped Phung on the Turnpike. Trial court opinion at 1–2; Phung, Volume II, Reproduced Record, Volume II, at 213 (Phung, R.R. ——). Sergeant DeLuca was the officer at the State Police barracks who counted the cash found in Phung's vehicle the night of his arrest.

2. The cash consisted of bills of different denominations wrapped in bundles of $5,000 or $10,000 held together by rubber bands. Only five $1 bills were included; the majority were $20 bills. Phung, Vol. I, R.R. 81a. After each $10,000, a $50 or $100 bill was folded and placed lengthwise over the bundle. By contrast, "normal" persons with a large amount of cash would carry the bills as banded by a bank. Phung, Vol. I, R.R. 82.

Pittsburgh for $70,000. Because the van's rental agreement had lapsed, the two were refused entry at the United States border. Law then contacted a friend who brought them a car; the friend also delivered $60,000 in U.S. currency from Phung's father, which represented Phung's savings from his job at a Canadian plastics factory. Phung and Law then drove to Boston and checked into a hotel. There, Phung met another friend, Hung, in the hotel parking lot, who gave him the vehicle in which Phung was stopped for speeding in Pennsylvania; Hung also gave Phung another $150,000 in U.S. currency. Phung then drove to Jersey City, New Jersey, where he visited his girlfriend, Kim, who gave him an additional $100,000 in U.S. currency. With this cash, to be used to acquire and expand a nail salon, Phung departed for Pittsburgh.[3]

After hearing Phung's story, the State Police seized the cash. Phung responded with an emergency petition for return of property with the Court of Common Pleas of Somerset County. At the hearing on Phung's petition, only the Commonwealth presented evidence. Agent Akins, of the FBI, and Trooper Berkebile testified about the results of their interviews of Phung, recounting Phung's explanation for how he came into possession of $310,020. The Commonwealth also offered the testimony of the dog handler and of the person responsible for counting the cash. At the conclusion of the hearing, the trial court held that Phung did not prove lawful possession of the cash. Accordingly, the trial court denied Phung's petition without prejudice to present new evidence on the

provenance of the cash at the subsequent forfeiture proceeding.[4]

To support its forfeiture petition, the Commonwealth offered the following evidence: the transcript of the hearing on Phung's motion for return of property; a certified copy of Phung's May 8, 2003, conviction of conspiracy to distribute ecstasy and possession with intent to distribute 7,560 tablets of ecstasy; and the testimony of Sergeant Randy Wasserleben, who explained the results of an ion scan done on the currency seized from Phung. In response, Phung offered his deposition testimony that was taken in prison where he was serving his sentence for his drug conviction. In his deposition, Phung explained how he came into possession of $310,020; in all material respects, his deposition was consistent with the account he gave the State Police and FBI on the evening of his arrest.

Critical to this appeal is the testimony of Sergeant Wasserleben who testified for the Commonwealth as an ion scan expert. He explained that an ion scan device measures microscopic levels of narcotics, able to differentiate between various controlled substances because the ions of various chemical compounds vary in weight. Thus, an ion scanner is able to detect the presence, quantity and type of narcotic present on the currency. The ion scanner is used to establish "casual contact" level of drug residue on currency in general circulation. In this case, 38 random samples of cash from Boston and northern New Jersey were tested in October of 2002. These tests established a casual

---

3. Phung was uncertain of the address of the nail salon, had never studied the accounting records of the salon and was uncertain about its prospects as a business venture. He could not explain why his job in Canada led to savings in U.S. currency, and he could not recall Kim's last name.

4. Phung thereafter filed an appeal to this Court, which we quashed because we concluded the trial court's order was not a final order. *See Phung v. Commonwealth* (No. 1123 C.D. 2002, filed November 18, 2002).

contact level of cocaine in Boston to be 77.2 digital units, and for northern New Jersey 33.47 digital units.[5] Ten samples of cash seized from Phung were tested. Nine of the ten samples seized from Phung registered hits for cocaine between 540 and 893 digital units; the "cocaine high" measured between 643 and 1137 digital units.[6] The tenth sample registered a level of ions consistent with the casual contact levels of cocaine for cash in general circulation. In short, the cash seized from Phung had ten to twenty times more cocaine residue than currency circulating in Boston or in northern New Jersey.[7]

The trial court granted the Commonwealth's forfeiture petition. The trial court found that the dog's alert, the denominations of the bills, the manner in which the cash was packaged, the levels of cocaine found on the cash, the very large sum of cash, Phung's subsequent drug conviction, and Phung's failure to provide a credible explanation for his possession of the $310,020 all supported the grant of forfeiture. In reaching this conclusion, the trial court relied upon our decision in *Commonwealth v. $11,600.00 Cash, U.S. Currency*, 858 A.2d 160 (Pa.Cmwlth.2004),

holding that the results of the ion scan is evidence of probative value where the Commonwealth seeks to show a nexus between the seized currency and illegal drug activity.

## No. 2765 C.D. 2004

The background to the second appeal is as follows. On May 22, 2004, Corporal Brian Merritt stopped a vehicle for speeding on the Pennsylvania Turnpike. Lawrence Russell Fair was the driver, and Herman Keese, Jr. was one of several passengers.

Corporal Merritt's suspicions were aroused when he discovered the following: Fair did not have a driver's license and was the subject of an outstanding arrest warrant in North Carolina; the vehicle had been rented, not to the occupants, but to an individual under investigation for stealing drugs; and Keese was a Virginia parolee. Accordingly, Corporal Merritt asked to search the vehicle. When a drug dog alerted at the passenger door of the vehicle, Brett Townsend, another passenger, denied the search request. The State Police then obtained a warrant and

---

5. The casual contact level of cocaine on cash in circulation in Pennsylvania is 234 digital units. Wasserleben explained the high count for Pennsylvania because the currency samples were collected from the "badlands" of Philadelphia. Phung, Vol. II, R.R. 145, 164, 169.

6. Sergeant Wasserleben explained that the ion scanner contains two channels. A sample of pure cocaine can blow out a channel and damage the machine. The cocaine high chamber is a safety precaution that tests higher concentrations of cocaine. Without this special channel, high concentrations of cocaine would not be detected. Phung, Vol. II, R.R. 137; *see also* No. 2765 C.D. 2004, Keese, R.R. 123a, 148a (Keese).

7. On cross-examination, Sergeant Wasserleben conceded that he advises the State Police

to hand-count money, wearing gloves, before an ion scan test is done. Here, because of the large amount of cash involved, a machine was used to count the cash on the evening it was seized from Phung. Wasserleben conceded that if the bank machine were contaminated, it could contaminate the money it counts. However, Wasserleben stated that in this case, the chances of contamination were "slim to zero," Phung, Vol. II, R.R. 153, and opined that the bank's machine had nothing to do with the levels of cocaine detected on the cash. Phung, Vol. II, R.R. 165. He explained that contamination would have resulted in all the ion scan samples showing the presence of cocaine, but they did not. Further, the levels of cocaine detected were varied. Notably, Phung's counsel did *not* object to the admission of the ion scan results. Phung, Vol. II, R.R. 207.

searched the vehicle, finding a shoebox filled with cash.[8] Keese informed Trooper Merritt that the cash totaled $131,000 or $132,000, that it belonged to him and that it represented the proceeds of a mortgage loan. Keese stated that he intended to use the cash in the shoebox to invest in a car and towing business in California and, in fact, he was on his way to California for that purpose when stopped by Corporal Merritt.

The amount in the shoebox was determined to be $141,370 and seized. Keese then filed a petition for return of property with the Court of Common Pleas of Cumberland County, and the Commonwealth filed a petition for forfeiture. The two petitions were consolidated for hearing.

In support of his petition, Keese and his father testified. Keese again offered an explanation for the source of the cash. The sum of $49,000 represented the proceeds of a mortgage taken out by his father in South Carolina; approximately $70,000 represented the proceeds of a loan his father received from a friend; and $31,000 was a loan from his ex-wife in Pennsylvania.[9] Keese stated that he did not have a bank account and, thus, kept the funds in cash at the homes of his two ex-wives who live in the Philadelphia area. Keese's father stated that his son worked for his tow truck business and earned "a couple hundred a week." Keese, R.R. 46a. He supported his son's account, stating that he gave his son $100,000, which mainly represented the proceeds of a mortgage loan in the amount of $90,000. On cross-examination, when confronted with con-

flicting documentary evidence from the mortgage loan transaction, Keese's father changed his story, conceding that the mortgage proceeds and loan together totaled $49,411.25.

To support its forfeiture petition, the Commonwealth offered the testimony of Trooper Susan Clark. She testified that the cash seized from Keese had been bundled in a manner consistent with the purpose of street level drug dealing.[10] The Commonwealth also presented the testimony of Sergeant Paul Pueyes, of the Pennsylvania National Guard, who conducted the ion scan testing, as well as the testimony of Joseph Jadamec, who testified as an expert about ion scan technology and the protocols of testing. The ion scan results revealed that the seized currency contained 1,199 digital units of cocaine high, 958 digital units of cocaine and 539 digital units of procaine, a cutting agent used to increase the amount of cocaine for sale. The casual contact levels for money in circulation was established to be 204.4 digital units in Pennsylvania and 196 digital units in South Carolina. Thus, the ion scan of the seized cash revealed six times more cocaine than one would expect on currency in general circulation in Pennsylvania or South Carolina. Procaine, the other detected substance, is rarely found on currency in general circulation and, thus, there is no established casual content level for it.

The trial court granted the Commonwealth's forfeiture petition and denied Keese's petition for return of property. In

---

8. The cash was bundled in varying denominations of $100, $50, $20, $10 and $5 bills, with each bundle totaling $5,000 or $10,000. The bundles were held together with rubber bands. By contrast, a bank would issue bundles of cash in the same denomination, and the bundles would be secured by a bank wrapper. Keese, R.R. 73a–74a, 171a.

9. The amounts of these various transactions, as well as their totals, changed in Keese's various statements.

10. *See supra* note 8.

doing so, the trial court credited the results of the ion scan that showed the presence of cocaine and procaine at levels not expected on currency in general circulation. Also found compelling was the way in which the cash had been packaged. On the other hand, the trial court found the testimony of Keese and his father to "strain credulity" and their account as to the origins of the $140,000 "completely unbelievable." No. 2765 C.D. 2004, Opinion at 9, 10. Relying upon our decision in *$11,600.00 Cash,* which involved strikingly similar facts, the trial court concluded that the seized money was furnished in exchange for cocaine, was traceable to such exchanges and was, therefore, subject to forfeiture.

## The Appeals

■■■ On appeal,[11] Phung and Keese first contend that the trial courts erred in concluding that the Commonwealth sustained its burden of proving a nexus between the seized cash and illicit drug activity with ion scan test results showing trace amounts of cocaine on the currency that exceeded the amounts expected for currency in general circulation. Assuming, *arguendo,* that the Commonwealth's evidence established the requisite nexus, Phung and Keese contend that they defeated the Commonwealth's *prima facie*

case by proving that they owned the cash, lawfully acquired it and lawfully used it. As their second issue, Phung and Keese assert that they proved the seized cash belonged to them, and their motions for return of property should have been granted. Phung and Keese request this Court to order that the cash be returned to them.

## Forfeiture Petitions

In their arguments that the Commonwealth failed to make out a case for civil forfeiture, Phung and Keese focus on the ion scan results.[12] They concede that the ion scan may have confirmed the presence of drugs on their cash, but it did not reveal how, when or where the cocaine came to be there. Further, because neither Phung nor Keese was observed to be selling drugs at the time the cash was found and seized, they contend that the Commonwealth's evidence proved only a suspicion of a nexus between the large sums of cash and some kind of illicit drug activity. A suspicion does not warrant forfeiture.

■■■ In a forfeiture of currency, the Commonwealth has the initial burden of proof. Under the statute known as the Forfeiture Act, 42 Pa.C.S. 6801–6802, the Commonwealth must show that the currency was "furnished or intended to be

---

**11.** This court's scope of review is limited to determining whether the trial court's findings of fact are supported by substantial evidence and whether the trial court abused its discretion or committed an error of law. *$11,600.00 Cash,* 858 A.2d. at 163 n. 3.

**12.** Neither Phung nor Keese challenges the validity of ion scan science and technology. The dissent's conclusion that it is "junk science" is not supported by any evidence in the record, expert or otherwise. The dissent's statistical argument that an inadequate number of bills were tested is interesting but, not being trained in regression analysis, the majority will not attempt a response. In any

case, the test set forth in *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923), was addressed in both cases, contrary to the dissent's claim. In Phung's case, the Commonwealth moved into evidence a decision of the Court of Common Pleas of Northampton County holding that the ion scan test is accepted under *Frye,* and the Commonwealth's witness was duly qualified to testify concerning the results of the ion scan. *Commonwealth v. Nine Thousand One Hundred Forty Six Dollars and 00/100 U.S. Currency ($9,146.00)* (Northampton Co., Misc. No. 332–2002, filed August 12, 2003). In Keese's case, the expert testified that ion scans are accepted and widely used in the scientific community. Keese, R.R. 135a.

furnished ... in exchange for a controlled substance ... [or represents] proceeds traceable to such an exchange ..." or that the currency was "used or intended to be used to facilitate any violation of The Controlled Substance, Drug, Device and Cosmetic Act."[13] 42 Pa.C.S. 6801(a)(6)(i)(A)(B).[14] Stated otherwise, the Commonwealth must establish that a nexus exists between the cash seized and a violation of the Controlled Substance Act, and it does so under a preponderance of the evidence standard, which is tantamount to a "more likely than not" standard. *Commonwealth v. $6,425.00 Seized From Esquilin,* 583 Pa. 544, 880 A.2d 523, 529 (2005). The Commonwealth need not produce evidence directly linking seized cash to illegal activity in order to establish the requisite nexus; circumstantial evidence may suffice. *Id.* Once the Commonwealth establishes this nexus, the burden then shifts to the person claiming the cash

to establish that he owns the money, that he lawfully acquired it, and that it was not unlawfully used or possessed by him. 42 Pa.C.S. 6802(j).[15]

The gravamen of both appeals is whether ion scan results, together with other evidence, including the way the seized cash was bundled and the inability of Phung and Keese to offer a credible account of how they came to possess huge sums of cash, are sufficient to make a case for forfeiture. Because civil forfeiture cases are fact sensitive cases, they have generated much litigation. Accordingly, we begin our analysis with a review of the precedent most relevant here.

In *Commonwealth v. Marshall,* 548 Pa. 495, 698 A.2d 576 (1997), the State Police stopped a vehicle on a routine traffic matter. It was quickly discovered that there were outstanding arrest warrants for some

**13.** The Controlled Substance, Drug, Device and Cosmetic Act (Controlled Substance Act), Act of April 14, 1972, P.L. 233, *as amended,* 35 P.S. §§ 780–101—780–144.

**14.** The Forfeiture Act provides in relevant part:

(a) Forfeitures generally. The following shall be subject to forfeiture to the Commonwealth and no property right shall exist in them:

. . .

(6)(i) All of the following:

(A) Money, negotiable instruments, securities or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance in violation of The Controlled Substance, Drug, Device and Cosmetic Act, and all proceeds traceable to such an exchange.

(B) Money, negotiable instruments, securities, or other things of value used or intended to be used to facilitate any violation of The Controlled Substance, Drug, Device and Cosmetic Act.

42 Pa.C.S. 6801(a)(6)(i)(A) and (B). *Commonwealth v. One 1988 Ford Coupe VIN #1FABP41A9JF143651,* 393 Pa.Super. 320, 574 A.2d 631 (1990) offers an excellent summary of the common law of civil forfeiture, its ancient roots and codification in the Forfeiture Act.

**15.** It states:

(j) **Owner's burden of proof.**—At the time of the hearing, if the Commonwealth produces evidence that the property in question was unlawfully used, possessed or otherwise subject to forfeiture under section 6801(a), the burden shall be upon the claimant to show:

(1) That the claimant is the owner of the property or the holder of a chattel mortgage or contract of conditional sale thereon.

(2) That the claimant lawfully acquired the property.

(3) That it was not unlawfully used or possessed by him. In the event that it shall appear that the property was unlawfully used or possessed by a person other than the claimant, then the claimant shall show that the unlawful use or possession was without his knowledge or consent. Such absence of knowledge or consent must be reasonable under the circumstances presented.

42 Pa.C.S. § 6802(j).

of the passengers, including Marshall, who was requested to step outside the vehicle. As he did so, he exposed a large sum of cash on the seat cushion. A search of the vehicle revealed $3,400, packaged in $100 bundles. No drugs or drug paraphernalia were found, but a dog alerted on the currency, indicating the residual presence of a controlled substance. At the forfeiture hearing, the Commonwealth presented evidence that Marshall and the driver of the car each gave inconsistent statements about the origins of the cash; the cash was bundled in a manner consistent with its use in drug dealing; and the drug-sniffing dog alerted on the cash. The trial court concluded the evidence presented was sufficient to demonstrate a nexus between the cash and illegal drug activity, and this Court affirmed.

Our Supreme Court reversed, holding that the proffered evidence proved nothing more than the "possibility" or "suspicion" of a nexus between the cash and some kind of drug activity. *Marshall*, 548 Pa. at 499, 698 A.2d at 579. The Supreme Court noted that neither drugs nor drug paraphernalia were found in the vehicle or on any of its occupants, and Marshall had been neither arrested nor convicted on drug charges. It concluded that "[e]ven when considered in conjunction with all the other facts relied upon by the trial court in this case, the residual presence of drugs on some part of the $3,400.00 in question establishes only the possibility or the suspicion of a nexus between the money and some type of drug activity." *Id.*

In *Commonwealth v. Fontanez*, 559 Pa. 92, 739 A.2d 152 (1999), Efraim Fontanez's vehicle was stopped in a neighborhood known for its drug trafficking, by an officer who knew Fontanez to be involved in narcotics activity. The officer found $2,650 in a paper bag on the floor of the vehicle. No drugs or paraphernalia were found, and Fontanez refused to offer any explanation for the cash. The Supreme Court held that failure to give an explanation, where none is required, is not evidence of misconduct; at most the failure was suspicious. The fact that a drug-sniffing dog had "alerted" added little or no support to the case because there was no way of telling whether one dollar or all of the money had been exposed to narcotics or whether the exposure to cocaine took place before or after the seizure.[16] Similarly, Fontanez' arrest for illegally transporting drugs two months after the seizure added little support because those charges were dismissed at a preliminary hearing.

In *$11,600.00 Cash*, distinguishing *Marshall* and *Fontanez*, we held that the results of an ion scan had probative evidentiary value that a dog's alert lacked. In *$11,600.00 Cash*, a police officer stopped Cristian Maracine's vehicle because the windows appeared to be illegally tinted. The officer discovered that Maracine was the subject of twelve outstanding warrants. When police took Maracine into custody, they searched him and found $11,600 packaged in large bundles in his pockets. He claimed that the money represented his earnings from work at Paolo's Pizza and that he was going to purchase a car. When asked how much money he had, Maracine responded that it totaled $8,000 or $9,000. The appellant first told the arresting officer that all of the money was his but later recanted, claiming that $2,000 of the total was a loan from his father. The money was later subjected to an ion scan, which revealed approximately

---

16. Notably, there was a two month gap between the dog's alert and the seizure of the cash.

five times the normal amount of cocaine found on cash in general circulation.

The Commonwealth filed a forfeiture petition, which the trial court granted. On appeal, this Court upheld the forfeiture for several reasons. First, we noted the inconsistencies in Maracine's statements to the on-scene police officer, such as the significant underestimate of the amount of cash he held. Second, we focused on the high concentration of cocaine discovered by the ion scan to be at a level nearly five times that expected for currency in general circulation. Third, we noted that Maracine offered no credible evidence to establish a legitimate source for such a large amount of cash.

We distinguished the case from *Marshall* because of the qualitative difference between an alert by a drug sniffing dog and the results of a highly scientific test:

> [A] drug sniffing dog merely detected the odor of a controlled substance on the money which indicated the residual presence of drugs on some part of the $3,400.00. Here, *unrebutted expert testimony established that there was an actual physical presence of cocaine on the money in quantifiable terms*. The evidence offered by the Commonwealth also showed that the quantity of cocaine on the money was five times more than that found on bills in general circulation.

*$11,600.00 Cash*, 858 A.2d at 165 (emphasis added). An ion scanner, unlike a dog's nose, can detect the quantity and type of narcotic on the currency. Thus, we held that the ion scan results, together with the rest of the evidence, supported the trial court's finding that the $11,600 seized was, more likely than not, used in drug trafficking.

This Court's decision in *$11,600.00 Cash* was not appealed, but it was cited with approval no less than seven times in *Esquilin*, our Supreme Court's most recent

pronouncement on what evidence is needed to support a forfeiture of cash. In *Esquilin*, Miguel Burgos and Richard Esquilin, who were standing together on a sidewalk in Philadelphia, were observed exchanging money for "small objects." After their arrest, crack-cocaine was recovered from Burgos, and $6,425 was recovered from Esquilin. Esquilin was charged with conspiracy and intent to deal drugs, but the charges were dismissed for lack of a prompt trial. Because the two men were observed trading three times, this Court held that only $60 of the $6,425 seized was subject to seizure. The Supreme Court reversed. In doing so, it announced certain principles to be used in evaluating evidence in a forfeiture case.

The Supreme Court criticized this Court for imposing a "standard in which logical inferences could play no role, and where the correspondence between fact and inference had to be entire." *Esquilin*, 583 Pa. at 561, 880 A.2d at 533. It held that the court's duty is to consider the "totality of the circumstances" and, in doing so, take care not to erect "artificial and absolutist evidentiary requirements ... to the question of whether a nexus exists between the money and violations, or facilitations of violations, of the Controlled Substance Act." *Id.* at 563, 880 A.2d at 534.

Phung and Keese contend that the outcome here should be governed by *Marshall* and *Fontanez* because neither drugs nor drug paraphernalia were found in their vehicles. Further, even though the cash seized from them was bundled in the manner of street drug dealers and dogs alerted on the seized currency, these points do not make the Commonwealth's case under *Marshall* and *Fontanez*. Of course, the striking difference here is the ion scan evidence, which was lacking in *Marshall* and *Fontanez*. Because Phung and Keese offer different arguments as to why the ion

scans should not produce a result different from *Marshall* and *Fontanez,* we consider each separately.

 Phung does not contest the validity of ion scans or their probative evidentiary value. He contends, however, that the test results in his case were flawed. Because the currency was put through a money counter borrowed from a bank *before* it was run through the ion scan, the samples of currency tested may have been contaminated by the bank's machines. This argument is not persuasive.

First, although it is true that Sergeant Wasserleben advises the State Police to hand count currency before doing an ion scan, this advice would have been very difficult to follow here, where the task was to count $300,000, the majority of which was in the form of $20 bills. Second, Sergeant Wasserleben testified that the counter did not taint the currency seized from Phung and explained his reasons for this conclusion.[17] Third, at the forfeiture hearing Phung did not object to the admissibility of the ion scan results; before this Court Phung challenges only the weight to be given to the evidence, but appellate courts do not reweigh evidence. Fourth, Phung did not raise the issue in his Concise Statement of Matters Complained of on Appeal, filed pursuant to PA. R.A.P. 1925(b), and, thus, it was not addressed by the trial court in its opinion.[18] In sum, the record does not support Phung's claim that the ion scan of the cash seized from him did not yield reliable results but, in any case, he has waived this issue.

Keese, by contrast, does not challenge the accuracy of the ion scan of the cash seized from him. He argues that the presence of illegal substances detected on that cash does not make any difference to the proper legal outcome here.[19] The fact that cocaine was detected at six times the expected level is meaningless, Keese argues, because there is no "verifiable standard by which one can presume that the currency came from drug dealing." Keese Brief at 22. Absent such a standard, the ion scan results show not a nexus but merely the suspicion of a nexus between the possession of the cash and drug activity. Keese acknowledges that *$11,600.00 Cash* requires a different legal result and sug-

---

17. Sergeant Wasserleben discounted Phung's theory of contamination testifying that the "chances of the bank's money or the bank's money counter contaminating the money is slim to zero because we had two alarms that also alarmed for THC [the active ingredient in marijuana]." Phung, Vol. II, R.R. 153. He explained that in every bank, and every time he conducted a casual contact analysis in Pennsylvania and other states, he had never found THC on the currency. Further, the "THC was on the money. THC doesn't stay around very long. . . . [Only] two out of 11 samples had traces of THC. . . . So if the bank's money counter had traces of THC on it all the samples would have alarmed because it would . . . have contaminated all the money. . . . That's why I would say that the bank's money counter did not contaminate the money." Phung, Vol. II, R.R. 154.

18. In his Rule 1925(b) Statement, Phung argued the "Commonwealth failed to demonstrate a nexus of criminal activity between the seized currency and an illegal activity" and the "Commonwealth failed to produce any evidence whatsoever liking (sic) the cash to any illegal activity on the part of Petitioner." Certified Record at docket entry no.30. As these statements have nothing to do with the methodology of the testing, the issue is waived. Our Supreme Court has held that when a trial court directs an appellant to file a Concise Statement of Matters Complained of on Appeal, any issues not raised in such a statement will be waived. *Commonwealth v. Lord,* 553 Pa. 415, 417–418, 719 A.2d 306, 308 (1998).

19. Keese objected to the admission of the evidence, but merely on the basis that it was cumulative of the evidence of the dog alert.

gests, therefore, that we overrule *$11,600.00 Cash.*

It is certainly the case that the facts in these appeals are nearly identical to those in *$11,600.00 Cash.* In all three cases the putative owner of the currency was not charged criminally in connection with the seizure,[20] and neither drugs nor paraphernalia were seized along with the cash. However, the cash was bundled in the manner of drug dealers, the amount of cash was very large and the amount of cocaine detected on the cash was many times the amount expected from casual contact. Indeed, the facts that favor forfeiture are even stronger in the appeals *sub judice.* Instead of $11,600, we consider over $140,000 in one appeal and over $300,000 in the other. Further, the level of cocaine detected is much higher in these appeals, ranging from six to twenty times the level expected for cash in general circulation.

Keese is correct in his premise that he can prevail only if we overrule *$11,600.00 Cash.* We decline to do so, particularly in light of the guidance from our Supreme Court presented in *Esquilin.* Evidence in a statutory forfeiture case is not to be subjected to an absolutist standard but, rather, a logical standard. The totality of the evidence, *i.e.,* the huge sums of cash involved, the way the cash was bundled, the scientific evidence of recent contact between the cash and controlled substances that cannot be explained by casual contact and the inability of Phung and Keese to offer a credible explanation for their possession of the cash seized, all support the existence of a nexus between the currency seized and its involvement in drug trafficking. To reverse *$11,600.00 Cash* would require that we renounce the principles

established in *Esquilin,* and this we lack the power to do. We hold, therefore, that the Commonwealth proved a nexus between the cash seized from Phung and Keese and a violation of the Controlled Substance Act.

Because the Commonwealth met its initial burden, it then became the burden of Phung and Keese to introduce evidence sufficient to rebut the Commonwealth's *prima facie* case. Neither was successful in this effort. In each case, the trial court found the explanations of Phung and Keese not worthy of belief. It is the function of the trial court, not the appellate court, to decide matters of credibility. *$11,600.00 Cash,* 858 A.2d at 163 n. 3. Neither Phung nor Keese was able to prove that he owned the money, lawfully acquired it and lawfully used it. Other than testimony, which was disbelieved, the two offered no evidence.

## CONCLUSION

Because we affirm the orders of the trial court granting the Commonwealth's petitions for forfeiture, we need not decide the issue of whether the court properly denied the motions for return of property filed by Phung and Keese. Accordingly, we enter the attached order affirming the trial court in each appeal.

President Judge COLINS dissents.

Judge SMITH–RIBNER dissents.

## ORDER

And now, this 8th day of March, 2006, the order of the Court of Common Pleas of Somerset County dated September 21, 2004, and the order of the Court of Com-

---

**20.** Although Phung was later convicted of drug possession and conspiracy, the convic-

tion arose from a different incident.

mon Pleas of Cumberland County dated December 1, 2004, are hereby affirmed.

### DISSENTING OPINION BY Judge FRIEDMAN.

I respectfully dissent. This case presents to this court an issue of first impression, i.e., whether ion scan test comparisons involving multiple samples of seized money are sufficient in a forfeiture proceeding to establish a nexus between the seized money and illegal drug activity when less than all of the samples register drug residue levels above the relevant "casual contact" level. This case also represents the first time that ion scan test comparisons have been challenged as a method for determining whether there is a nexus between seized money and illegal drug activity. For the reasons stated below, I consider the comparison of ion scan test results for seized money with ion scan test results for money in general circulation, as done in these cases, to be nothing more than junk science.[1]

### I. 2454 C.D. 2004

The trial court found that, on April 4, 2002, Sergeant Anthony DeLuca (Sgt.DeLuca) of the Pennsylvania State Police stopped Dien Vy Phung's (Phung) vehicle on the Pennsylvania Turnpike for speeding. Sgt. DeLuca asked to look through the car, and Phung consented. In the trunk, Sgt. DeLuca found a large amount of cash. Phung explained that he was traveling from Boston to Pittsburgh to buy a nail salon and that it is customary for people of Vietnamese extraction to pay with cash. Phung stated that he had saved $60,000 from his employment in Canada and that he borrowed $150,000 from a friend in Boston and $100,000 from

his girlfriend in New Jersey. When a drug dog "alerted" on the money, the Commonwealth seized the $310,020 and filed a forfeiture petition.

At the forfeiture hearing, the Commonwealth presented the testimony of Sergeant Randy Wasserleben (Sgt. Wasserleben), who is an expert in ion scan technology. Sgt. Wasserleben testified that an ion scan machine is able to detect the amount of drug residue on a sample of money, which then can be compared with the "casual contact" level, i.e., the level of drug residue found on currency samples in general circulation, for the area in which the seized cash was known to have circulated.

Sgt. Wasserleben recommended the following testing procedure for seized money: (1) police hand-count the money while wearing gloves, to avoid contamination; (2) police fan out the money until the white bands are showing; (3) police run a vacuum known as a "dust buster" over the edges of the money to collect any drug residue; (4) police place the filter from the "dust buster" in the ion scan machine, which registers a max amplitude for specific drugs; and (5) police count the money using a money-counting machine. (R.R. II at 123, 128–29, 146.) When Sgt. DeLuca tested Phung's money, he did not follow this procedure. Instead, he used a bank's money-counting machine to count the money before performing the ion scan test. (Trial ct. op. at 3.)

The Commonwealth presented no evidence regarding the "casual contact" level for Canada. The "casual contact" levels for Boston and New Jersey were determined as follows: (1) thirty-eight currency samples were obtained from banks and/or

---

1. The majority states that the record contains no evidence to support this assertion. (Majority op. at 160 n. 12.) However, the discussion that follows is based on the evidence in the record.

businesses in a particular area, with each sample containing four bills of each denomination from the five-dollar bill to the one-hundred-dollar bill, i.e., twenty bills per sample; (2) the samples were fanned out; (3) the "dust buster" collected particles from each sample; (4) the "dust buster" filter was placed in an ion scan machine, which registered a max amplitude; and (5) the max amplitude was divided by thirty-eight to give the average drug residue on each sample of twenty bills. Sgt. Wasserleben stated that the "casual contact" level is 77.2 digital units for Boston and 33.47 digital units for northern New Jersey. (R.R. II at 125, 144–45.)

Sgt. Wasserleben was not involved in the ion scan testing of the $310,020; the testing was done by Sergeant Alvin Griffin (Sgt.Griffin). Sgt. Griffin tested ten samples, and nine of the ten samples registered max amplitudes for "cocaine" between 540 and 893 digital units or for "cocaine high" between 643 and 1137 digital units. Sgt. Griffin stated that the size of each sample was based on the "luck of the draw," i.e., whatever could be placed on the surface being used for testing. Sgt. Griffin testified that the smallest sample consisted of $20,000 and the largest sample consisted of $60,000. (R.R. II at 178–82, 184–85, 205.)

The question before this court is whether the Commonwealth met its burden of proving a nexus between the seized money and illegal drug activity with its ion scan evidence. In Part A, I address the inadequacy of the ion scan evidence in this case to establish a nexus between all of the seized money and illegal drug activity. In Parts B through E, I address the four reasons given by the majority for concluding that Phung cannot prevail on this issue.

### A. Ion Scan Evidence

### 1. Sample Size

The record shows that the "casual contact" sample size is twenty bills, but the Commonwealth did not present evidence regarding the number of bills in a sample size for the seized money. Unless sample sizes are the same, I fail to see how there can be any legitimate comparison between the ion scan test results for seized money and the results for "casual contact" money.

Sgt. Griffin testified that, with respect to the sample size for the seized money, the number of bills was whatever fit on the surface he used for testing. In terms of the amount of money, Sgt. Griffin testified that the *smallest* sample was $20,000. Assuming that the $20,000 consisted of 200 one hundred dollar bills (200 × $100 = $20,000), the ion scan evidence would be comparing the drug residue on 200 bills with the drug residue on twenty bills.[2] It certainly would not be surprising to me to find ten times the amount of drug residue on 200 bills than on twenty bills (20 × 10 = 200). Until ion scan test comparisons take into account the size of the money samples tested, I submit that, scientifically, the comparisons are worthless.[3]

---

2. Generally speaking, in this court's case law, the bill of the drug trade is the twenty-dollar bill. If the $20,000 had consisted of twenty-dollar bills, there would have been 1,000 bills (1,000 × $20 = $20,000) in the sample.

3. I note that the Commonwealth failed to present evidence that, under *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), this type of comparison has general acceptance in the relevant scientific community. *See Grady v. Frito–Lay, Inc.*, 576 Pa. 546, 839 A.2d 1038 (2003) (adopting the *Frye* test). The *Frye* evidence presented by the Commonwealth establishes only that ion scan testing is accepted as a means for determining the amount of drug residue on a sample of currency.

In addition, because the ion scan test procedure deals with samples of multiple bills, the test results pertain only to the sample as a whole. The test results do not relate to particular bills within the sample. In other words, there is no way to know from ion scan test results which of the possibly thousands of bills in a sample contains the drug residue. Thus, the majority holds that, even though only a few bills in a sample, taken together, contain drug residue that exceeds "casual contact" levels, the entire sample may be forfeited.

### 2. "Casual Contact" Level Manipulation

The record shows that, in a given case, "casual contact" figures can be manipulated by collecting money samples from banks or businesses in areas with either high or low rates of illegal drug activity. Sgt. Wasserleben testified that "casual contact" levels depend on where the samples are collected. He stated that the "casual contact" level he reported for Pennsylvania, 234 digital units, is more than seven times higher than the "casual contact" level for New Jersey ($33.47 \times 7 = 233.89$) and more than three times the "casual contact" level for Boston ($77.2 \times 3 = 231.6$) because the Pennsylvania samples were collected from the "badlands" of Philadelphia.[4] (R.R. II at 145, 164, 169.) Thus, I question whether it is possible to draw any reasonable conclusion from a comparison of the drug residue levels on seized money with the levels on "casual contact" money.[5]

### 3. $20,000 Passes Ion Scan Test

The ion scan evidence shows that only nine of the ten samples registered drug residue levels above "casual contact" levels. One $20,000 money sample "passed" the test. (R.R. II at 141, 205.) Thus, it appears to me that the Commonwealth failed to prove a nexus between this $20,000 and illegal drug activity.

Indeed, it is not explicit in the majority's opinion, but the majority's holding is that ion scan evidence can establish a nexus between seized money and illegal drug activity even when *less than all* samples exceed "casual contact" levels. Given such a holding, it seems that the Commonwealth could establish a nexus between *all* seized money and illegal drug activity when only *one* of ten samples exceeds "casual contact" levels. I could not accept such a result. Moreover, I point out that, because the majority's holding pertains to multiple samples of seized money, the majority's holding expands this court's previous holding in *Commonwealth v. $11,600.00 Cash, U.S. Currency*, 858 A.2d 160 (Pa.Cmwlth.2004) (holding that ion scan evidence showing that drug residue on seized currency is five times more than on bills in general circulation is sufficient to negate an inference of casual contact), which dealt with only one sample.

### 4. $60,000 From Canada

The record shows that $60,000 of the currency was from Canada, and the Commonwealth presented *no* evidence as to the "casual contact" level for United States currency circulating in Canada. (R.R. II

---

4. I submit that the Commonwealth cannot establish the appropriate "casual contact" level without presenting: (1) credible evidence regarding the geographical origins of the seized money; (2) expert testimony regarding what constitutes a statistically valid "casual contact" sample; and (3) expert testimony regarding the standard deviation for "casual contact" samples taken within a particular area.

5. I also question the validity of establishing a "casual contact" level for an entire state based on the collection of samples from certain neighborhoods of one city.

at 174, 176.) Thus, the Commonwealth failed to prove a nexus between this $60,000 and illegal drug activity.

## B. Waiver

The majority concludes that Phung waived any challenge to the ion scan evidence because he failed to raise a challenge in his statement of matters complained of on appeal pursuant to Pa. R.A.P. 1925(b). I disagree.

In this case, the trial court issued an opinion and order on September 21, 2004, relying on the ion scan evidence to conclude that the Commonwealth proved a nexus between the seized currency and illegal drug activity. (R.R. II at 219–20.) Phung filed a notice of appeal, and the trial court issued an order directing Phung to file a statement of matters complained of on appeal. (R.R. II at 226.) Phung filed a statement, asserting that the "Commonwealth failed to demonstrate a nexus of criminal activity between the seized currency and an illegal activity." (R.R. II at 227.) Inasmuch as the trial court relied on the ion scan evidence to conclude that the Commonwealth demonstrated a nexus between the seized cash and illegal drug activity, it is clear to me that Phung challenged the sufficiency of the ion scan evidence.

Although Phung did not refer specifically to the ion scan evidence in his statement of matters complained of on appeal, the dismissal of an appeal under Pa. R.A.P. 1925(b) for lack of specificity is not proper. *Ryan v. Johnson*, 522 Pa. 555, 564 A.2d 1237 (1989). Pa. R.A.P. 1925(b) is designed to assist a trial judge in writing an opinion which addresses only the issues being raised on appeal. *Sung Choe v. Philadelphia Board of License and Inspection*, 847 A.2d 214 (Pa.Cmwlth.), *appeal denied*, 580 Pa. 707, 860 A.2d 491 (2004). If a trial judge views a statement

of issues furnished under Pa. R.A.P. 1925(b) and determines that it lacks adequate specificity to permit the preparation of an opinion addressing the issues on appeal, the trial court is to order that a more explicit statement be filed. *Ryan.* If an appellate court believes that the trial court's failure to require a more explicit statement would hamper its review of a case, the appellate court is to remand the case to the trial court for compliance with Pa. R.A.P.1925(b). *Ryan.*

In sum, I find no defect in Phung's statement of matters complained of on appeal. However, to the extent that the majority is hampered in its review by the failure of the trial court to require a more explicit statement, the proper disposition is to remand this case to the trial court for an order directing a more specific statement of matters complained of on appeal.

## C. Reweighing the Evidence

The majority concludes that Phung's challenge to the sufficiency of the ion scan test results would require that this court impermissibly reweigh the evidence. In reaching this conclusion, the majority states that Phung did not object to the admissibility of the ion scan test results. I disagree.

The record establishes that Phung objected to the admissibility of the ion scan evidence. After Sgt. Wasserleben was presented as an expert on ion scan technology, Phung stated, "I'm not going to object to his qualifications. *I will, however, object to the ion scan itself* ...." (R.R. at 133) (emphasis added). At the conclusion of the hearing, the court advised the parties to file briefs addressing "the admissibility of the ion scan" as well as the forfeiture. (R.R. at 209.) Thus, the presiding trial court judge obviously believed that Phung had challenged the admissibility of the ion scan evidence.

Even if Phung had not challenged the admissibility of the ion scan evidence, the question presented here is no different than the one addressed in *Commonwealth v. Marshall,* 548 Pa. 495, 498, 698 A.2d 576, 578 (1997), which was "whether the trial court erred in concluding that the evidence presented was sufficient to sustain the Commonwealth's burden" of establishing by a preponderance of the evidence a nexus between the seized money and illegal drug activity. Without impermissibly reweighing the evidence, our supreme court held that the trial court erred in concluding that the evidence presented was sufficient to sustain the Commonwealth's burden. *Id.* Thus, the question of the sufficiency of the ion scan evidence in this case is a question of law, and it is properly before this court.

### D. Bank's Money Counter

The majority concludes that Phung cannot prevail on his challenge to the sufficiency of the ion scan test results because, although Sgt. DeLuca failed to follow recommended procedures by using a bank's money-counting machine prior to the ion scan test, Sgt. Wasserleben opined that the chance of contamination from the bank's money counter was slim to zero. I disagree.

Sgt. Wasserleben's opinion was only that the chance was slim to zero that the bank's money counter was contaminated with THC, i.e., marijuana. He testified that only two samples registered hits for THC and that, if the money counter had been contaminated with THC, then all of the samples would have been contaminated with THC.[6] (R.R. II at 153–54.) However, Sgt. Wasserleben also testified about possible contamination by the money being

counted. (*See* R.R. II at 167–68.) In this regard, Sgt. Wasserleben testified:

Q. But if part of this money was highly contaminated it could have contaminated every other bundle afterwards, at least with the cocaine and cocaine high?

A. It could have, yes.

. . . .

Q. And if the second sample they had run through the machine had been highly contaminated with cocaine and cocaine high, it's possible that every following sample would also have been contaminated?

A. It could, yes.

. . . .

Q. But just to clarify, taking what you're saying at face value, that this bank's money counter was not contaminated, okay, taking that at face value, is it still not possible that the money itself was contaminated and by running it through a money counter you contaminated all the money or at least some segment of the money was contaminated?

A. Yes . . . .

(R.R. II at 158, 164, 167–68.) Given such testimony, I submit that Sgt. DeLuca's failure to follow recommended procedures by using a bank's money counter before the ion scan testing was conducted renders the ion scan evidence worthless.

### E. Difficulty of Hand–Counting

The majority concludes that Phung cannot prevail on his challenge to the sufficiency of the ion scan test results based on the use of a bank's money counter because it would have been very difficult to hand-

---

6. This same reasoning would apply to the cocaine because only nine of the ten samples registered hits for cocaine. If the bank's money counter had been contaminated with cocaine, then all of the samples would have been contaminated.

count $300,000 in the form of $20 bills. I disagree.

First, the record shows that the money consisted of all denominations of currency, not just $20 bills. (*See* R.R. II at 137–42.) Second, the fact that the recommended procedure is very difficult does not mean that it need not be followed in order to obtain valid test results. Third, upon the taking of property pursuant to a search warrant, a law enforcement officer must provide a receipt for the property seized. *See* Pa. R.Crim.P. 208 (relating to seizure pursuant to a search warrant). Obviously, it is not possible to give a receipt for $310,020 in currency unless the police have counted the money. Although it may be very difficult, the law requires it.

## II. 2765 C.D. 2004

On May 22, 2004, Corporal Brian Merritt (Trooper Merritt) stopped a vehicle for speeding on the Pennsylvania Turnpike. Herman Keese (Keese) was a passenger in the car. Trooper Merritt, after gathering information about the driver, called for a drug dog, which alerted at the passenger door of the vehicle and in the luggage area. After obtaining a warrant, the police searched the vehicle and found a large amount of cash. Keese told Trooper Merritt that the money belonged to him. The police seized the money, a total of $141,370, and the Commonwealth filed a petition for forfeiture.

At the forfeiture hearing, Keese presented evidence showing that portions of the seized money came from South Carolina, San Francisco, Pennsylvania and Georgia. However, the trial court found Keese's evidence as to "where the seized $141,370 came from" to be "completely

unbelievable." (Trial ct. op. at 10.) The Commonwealth presented expert testimony that ion scan levels are meaningless in forfeiture cases without "casual contact" levels. (R.R. at 158a.) The Commonwealth then offered ion scan evidence showing that the level of cocaine on the seized money was six times higher than "casual contact" levels in Pennsylvania and South Carolina.[7] The Commonwealth presented no evidence regarding the "casual contact" levels for San Francisco or Georgia.

The question before this court is whether the Commonwealth's ion scan evidence is sufficient to establish a nexus between the seized money and illegal drug activity. Inasmuch as the trial court rejected all evidence regarding the geographical origin of the seized money and made no specific finding as to where the money had been in circulation, the Commonwealth's evidence regarding the "casual contact" levels for Pennsylvania and South Carolina means nothing. Absent the "casual contact" evidence, the ion scan test results for the seized money are meaningless. Thus, the Commonwealth's ion scan evidence is not sufficient to establish a nexus between the seized money and illegal drug activity.

The majority states that, in order for Keese to prevail here, this court would be required to overrule *$11,600.00 Cash*. However, in *$11,600.00 Cash*, the ion scan evidence was not challenged. Indeed, this court stated that the appellant did not "object to the use of the ion scan machine...." *$11,600.00 Cash*, 858 A.2d at 166. Thus, it would not be necessary to overrule that case here.

The majority also states that this court would have to renounce the principles es-

---

7. To determine the "casual contact" level for South Carolina, the Commonwealth collected money from a bank in Greenville, South Carolina, and a bank in Pendleton, South Carolina. (R.R. at 164a–65a.) Normally, the Commonwealth would collect four samples of each denomination of currency; however, the Pendleton bank had only one ten-dollar bill and only three five-dollar bills. (R.R. at 165a.)

tablished in *Commonwealth v. $6,425,00 Seized From Esquilin*, 583 Pa. 544, 880 A.2d 523 (2005), specifically that "[e]vidence in a statutory forfeiture case is not to be subjected to an absolutist standard but, rather, a logical standard [based on the totality of the evidence]." (Majority op. at 165.) However, it is not logical to base any conclusion about seized money and illegal drug activity on ion scan evidence when that evidence lacks appropriate "casual contact" levels. Thus, I cannot agree that ruling in favor of Keese in this case would require that this court renounce the principles established in *Esquilin*.[8]

Accordingly, I would reverse.

Judge SMITH–RIBNER concurs in the result only.

---

8. Moreover, because *Esquilin* was a drug bust case, it is not controlling here. Indeed, this case is more akin to *Marshall* and *Commonwealth v. Fontanez*, 559 Pa. 92, 739 A.2d 152 (1999), where, as here, the money was seized in traffic stops. In those cases, our supreme court stated that the presence of drug residue on some part of seized money establishes only the possibility or suspicion of a nexus between the money and illegal drug activity. *Id.*